Good morning, Your Honors. Ahil and I are the line of them for the ACLU of Southern California and ACLU Immigrants Rights Project as amicus, and I've reserved two minutes, Your Honors. These three cases involve lawful permanent residents who've been incarcerated in jails for between three and a half and almost five years. And the habeas court below and this court to review now presents the only opportunity for judicial inquiry into the legality of that detention. Now I'll address two questions, first, jurisdiction, and second, how as a practical matter we believe CASA's hearings have to be different from regular bond hearings. With respect to jurisdiction, Your Honors, the party's briefing has narrowed the issues considerably. Regardless of whether we're talking about the statutes or the suspension clause, both sides agree that questions of law, including mixed questions of law in fact are reviewable, whereas purely discretionary issues are not. And where we disagree is about whether the ultimate determination that a given detainee's prolonged detention is justified based on danger or flight risk is a mixed question or instead a discretionary decision. We believe it has to be a mixed question for three reasons. First, the identical question, analytically identical question, arises routinely in pretrial criminal detention cases. Now the substantive standards might be different and hopefully we'll talk about that later, but the kind of question it is, whether a person's danger or flight risk is sufficient to justify their prolonged civil detention, arises routinely and the courts are uniform, it's a mixed question subject to the same review that mixed questions get both in the district court and by this court on appeal from pretrial detention orders. And the BIA, for what it's worth, in unpublished cases involving CASA's appeals has done the same thing, treating it as what they call a question of judgment, which is a mixed question in the BIA's parlance. Second, there's a long line of habeas cases in the immigration context, stretching back into the time period when habeas was limited to the maximum extent permissible under the Constitution and in those cases the courts, the federal courts, reviewed challenges to detention pending completion of judicial review. And that's been true from that time period. Carlson v. Landon, we cite, and the government of the curious, they never answer Carlson v. Landon in their two briefs responding to our amicus brief, but Carlson decided in 1953, but under the pre-1952 legal regime, addresses the question whether somebody, not even for a prolonged time, they exempt that question, but even for a short time can be detained as a danger pending completion of removal proceedings and they address that question on the merits. It also cites a Second Circuit case from 1948, I think, U.S. Ex Rel. Potash. That case cites a lot of other cases. And these were done in the circuit courts as a routine matter, prolonged, excuse me, some prolonged detention, some not prolonged detention, but detention pending completion of proceedings, and they reviewed for a reasonable foundation. Is there a reasonable foundation that the person actually is a danger or a flight risk sufficient to justify the detention? Zedvitus builds on that body of doctrine. And here I'm talking about the jurisdictional part of Zedvitus. And of course, it's the holding of the courts that the conclusion that someone's removal is reasonably foreseeable is reviewable in habeas. And that sounds like a fact-intensive question, but it has an ultimately legal component. And for that reason, district courts have to review that in habeas. In addition, actually seven justices in Zedvitus, I think, would believe that the this question is reviewable that we have here today. Justice Kennedy, of course, dissents on the question, thinks that the court should be Before you're going to use up all your time that you've argued in the brief on issues, how about telling us specifically how do you apply the mixed question in a CASA's hearing? There's a fact-intensive inquiry by the IJ into whether there's danger or risk of flight. What is the district court role if you're talking about initial habeas? What is the legal issue for the district court? Whether the IJ made a reasonable decision? Well, I think the word used in Boumediene is whether there's a sufficient basis for the cause for detention. You know, what that means in practice, Your Honor. Is that a de novo review or an abuse of discretion? I think the facts, the historical facts, are clear error. Was the person convicted of this or that? Was there a post-sentence conduct that was bad or whatever? Whether those facts add up to sufficient dangerousness to justify detention of five years or three years, that question is reviewed de novo. And that's the way mixed questions are reviewed in habeas, I think, throughout. So it's the same review that's reasonable foundation review in Carlson v. Landon. So when you say five, I just want to, these cases come up in a variety of postures. The question is whether they're going to be held in detention for a period of time which is uncertain. It's prolonged but uncertain because it's subject to the vagaries, predictable as they may be, in terms of having a finite end, hopefully, a variable. So somebody can be reviewed in one of these hearings when they've been incarcerated or in detention for one year, two years, three years, probably some are four years. You're talking about five years or six years. What is the function of time in your analysis? You're saying it's a de novo review, so essentially the IJ gives a review and after somebody's been in for two years and the district court then automatically reviews that de novo to determine whether the IJ made a proper decision? No, not exactly, Your Honor. I think the immigration judge's review obviously has to change. Now we're talking about the merits just for a second, right? The immigration judge's standard for how much danger is necessary or how much flight risk is necessary does have to vary based on both the past detention and the future detention. I don't think it's all that complicated. You look at the briefing schedule in this court and that's the basic way you figure that out. And if the case is far along, then that's less future detention. And then also you have to look a little bit, as they do already, into the likelihood of success. Now, when the district court reviews that, and I don't think the whole thing is de novo. Obviously there's going to be deference paid to the factual parts of the immigration judge's findings, including both, I think, the assessment of the criminal history, what was the criminal history, and other similar questions like about family ties and things like that. But the ultimate question, does that add up to enough justification to lock someone up without a trial for five years? That has to be reviewed by the district court de novo, in the same way that mixed questions often are. And, Your Honor, that really is dictated. I think that result is dictated by the suspension clause. It's dictated, it's the same thing that the Supreme Court is doing in Boumediene. The CSRT does a detailed review, but then the district court independently assesses the sufficiency of the evidence as to the cause of the detention. And I think that has to happen in these cases as well, Your Honor. The alternative, this is the last thing I'll say on jurisdiction, Your Honor. If the government's position is right, that you're only reviewing the procedural constraints, and you're not actually reviewing the ultimate determination that someone should be locked up or not, then you get the situation where when the immigration judge, say, finds the person is a danger based on just possession of marijuana, you know, like what the ICE did with Mr. Joof, you know, the last case on the calendar, right? If the immigration judge does that but recites the correct standard and cites, you know, the, this court's law, then there's no further review of that at all, even if the person's detained for five years, seven years, ten years. And we don't think that can be right. And it would be inconsistent with the prolonged civil detention case law, which says that there's both a sufficient justification and adequate procedures that both have to be present in order for detention to be justified. That's true not only in the indefinite detention context in Zebaitis, it's also true in Salerno when they're doing the analysis of the prolonged civil detention due process analysis there. Obviously, there's going to be a trial, right? So it's not, it's not any more indefinite than it is here. But because it's prolonged civil detention, the court requires both inquiry into the sufficiency of the procedures, excuse me, the sufficiency of the evidence and inquiry into the adequacy of the procedures in a given case. Your Honor, I'll reserve the rest of my time. Okay. Okay, please. The court, William Warrick for the United States. With me is Neelam Isinula. Your Honor, the three cases that are grouped for argument by the court involve criminal aliens who've been ordered removed from this country at the conclusion of the administrative process by the Board of Immigration Appeals. One of those cases has been remanded, and we'll talk about that later. Removal to their home countries is foreseeable. Each has received a bond hearing after the order of removal pursuant to Cass's Castrillion, where the government bore and met the burden of proving that the alien was a danger to the community and were a flight risk. Each received all the process that he's due, and we'll be asking the courts to deny the appeals and the writ of habeas corpus. Let me make two foundational points. The first one, the primary purpose for detention for criminal aliens is availability for removal. And this matters because 62% of aliens released from detention will be issued final orders and fail to surrender or abscond in accordance with a 2006 DHS report. That contrasts with pretrial criminal detention or civil commitment. Second, while these cases involve prolonged detention, they don't involve indefinite detention. And this is so because they're in the midst of their review for the petition of review, which has a finite ending. Or in the case of the last case, they're in the administrative process. And because none is in the sabidus limbo of removable and yet non-reviewable. Removable, because removal to their home country is possible. So with that foundation, let's look at the jurisdictional issues. And in this case, the kind of habeas review which is being desired by the petitioners is precluded by 8 U.S.C. 1226E. And where the, it's, Congress could not have been more clear that the Attorney General's discretionary determinations cannot be reviewed by the courts. The... At all. At all. So that if the IJ looks at the record and finds that somebody was convicted of a DUI, that's the criminal history. And has lived in the United States for 20 years, has family and has a small business. And decides the person's a danger to the community and a flight risk, that the court has no role in reviewing them. That's correct, Your Honor. The review goes to the Board of Immigration Appeals and that board. And the time, well-established process for dealing with these bond hearings, that's how those decisions get made. What the court has review over is constitutional problems. So if they raise to a constitutional level, they do, or structural issues. But it is a very limited ability to review. And if the person had no criminal history and the same decision was made, no court review? So whatever the IJ and the BIA decide, your position is whatever the BIA and the IJ decide about flight risk or danger, regardless of whether there's any substantive evidence to support either determination, the district court has no role. If there is a constitutional... That would be correct if there is no constitutional violation. The IJ uses the GARA factors to consider the flight risk and danger. And with, again, primary purpose of determining that the alien is available for removal. That's what Congress laid out. Counsel, would you help me unpack 1226E? There are two sentences there. If you had just the second sentence, I think your argument would be much, much stronger. Because that simply says no court may set aside a decision by the Attorney General under this section. But the first sentence says that the Attorney General's discretionary judgment shall not be subject to review. Now are those two independent sentences referring to different parts of proceedings under 1226? Are they meant to be read as a whole? And if so, what do we do with the fact that Congress made unreviewable discretionary judgments, which may not be judgments of law? Your Honor, I think they are read independently, but they actually make it stronger as opposed to weaker. Okay, so what does the first sentence apply to? The first sentence applies to any discretionary judgment which the Attorney General makes with respect to that section. So it does, it applies to anything that relates to, in this situation, the bond hearing. Why don't we just, why didn't Congress just give us the second sentence? I think what Congress was trying to do was to be as explicit as it could be that the court did not have a role in looking at the discretionary determinations in bond hearings. I think that's what they were trying to say there. Because if they just left us with that second sentence, that would simply say there is no judicial review for any proceeding under this section. That surely would have covered discretionary judgments. The fact that they gave us the first sentence in some ways seems to question what is reviewable and what isn't reviewable. I do believe that they are independent, and the second sentence I think is explicit. And I think they were just trying to do boots and suspenders with respect to that sentence. The petitioners cite Boumedin for the notion that the review here should be much broader. But Boumedin is a very different case. First of all, it's indefinite detention. Second of all, there have been no adjudications with respect to them ability to get out, hear whether the alien is removable or not. The CSRT process was a new process. Bond hearing process is one that dates back to the 19th century. And so when you compare those two sets of detainees, I think the law is just very different and the court should view it very differently. The my colleague didn't go into the burden of proof. Well, I don't know how you're going to divide up your argument the way. So I will be arguing all of the cases, and I'm happy to address. Why don't you address the arguments that have been made and not anticipate. Very good. If the court has no other questions with respect to the issues raised, then I have nothing further. You see no constitutional issue, then, notwithstanding that the attorney general through the BIA and IJ would commit a clear abuse of discretion. For example, if we were reviewing a district court's determination on whether to, whether it's a pretrial detainee in the criminal system or post-verdict or post-conviction, and it was a clear abuse of discretion not to grant bail pending trial or pending appeal, that in the case of a detainee immigrant, there's no constitutional issue about keeping somebody detained for several years even though it would be a total abuse of discretion. Abuse of discretion is a discretionary act, and that does sit under 1226E with the attorney general. And remember, Your Honor, you have somebody who has already been determined in this situation to be removable administratively. Actually, in Leonardo's case, I think, wasn't he sent back by a panel of this court? Yes. And he challenged that determination. Yes, and he has the right to have another bond hearing to show that his circumstances are different. When we get to his case, there are reasons why you wouldn't want to do that. Let's take that. So if at the Leonardo, take that as an example, the removability has not been finally determined. It may turn out to be overturned through, and I think in that case, it was ineffective assistance of counsel. So if the I.J. holds a hearing while that is pending before the I.J. and makes the same decision, no release, nothing, clear abuse of discretion, by any normal abuse of discretion standard, now there's no longer a finding of removability. How does that affect your argument? We're still, I believe, in 1226A. I think we're in the same place, Your Honor. E? I'm sorry, and E, yes. So no matter what stage of the proceeding, once the BIA has ordered somebody removed or an I.J. and the BIA has affirmed it, then it's all up to the Attorney General and the immigration adjudicatory apparatus to decide whether or not there's cause to keep this person in detention for years and years. The discretion, again, does respond. Unless it moves into indefinite detention under Zavita. Exactly right. As long as we're in prolonged detention, that's the government's position. Okay. Thank you, Your Honor. Four points, Your Honors. With respect to jurisdiction, two things briefly. I agree with you, Judge Bivey, that 1226E's two sentences have to be read together. If they're read separately, then the claim in DeMaury v. Kim should be dismissed for lack of jurisdiction. The Court doesn't do that because the second sentence is meant to be modified by the first. It's discretionary decisions that are the actions or decisions of the Attorney Generals that are at issue. Second, abuse of discretion. Judge Fischer, what you're talking about, in the liberty context, most decisions that we would think of as abuses of discretion are going to implicate due process problems. And that's the reason why they're reviewable. Was it procedural or subsequent? Well, it's whatever's happening in Salerno. It's unclear. It's whatever's happening in Salerno, in Fuchsia, in this Court's decision in Gelfuso, where you have prolonged detention, but nonetheless, it's really long and it's happening without trial. On the question of whether it's pragmatically different, right, the CASAS hearing has to consider alternatives to detention. And this is a critical point, Your Honor. It happens in the Bail Reform Act now, although, of course, the time periods are much shorter there. But there has to be consideration of whether house arrest, electronic monitoring, or other kinds of intensive supervision can be an alternative to imprisonment, and what we're talking about is imprisonment for four or five years. And then the last thing I wanted to say, Your Honor, was the protections of CASAS will be rendered meaningless if an immigration judge can find someone at flight risk based just on the fact that they've been ordered removed, which is what happens in V. Singh's case, or finds them a danger just based on their criminal history, because, of course, probably everyone in a CASAS hearing has some kind of criminal history. So there has to be judicial oversight over those ultimate questions, and that ultimate determination after you've given due deference to the facts, whether they add up to enough flight risk or enough danger. Are there no further questions from the Court? Okay. Thank you, Your Honor. Okay, the next argument is going to be, as I understand it, V. Singh? Yes, Your Honor. Counsel? May it please the Court. My name is Scott Grunzik, a certified law student under the supervision of Holly Cooper, and I represent the appellant, Vijendra Singh. Reserve two minutes for rebuttal. Mr. Singh has been detained for over three and a half years as a result of an informal administrative process. Despite the significant deprivations of his liberty, this administrative process failed to provide basic due process protections. This Court should reverse the decision of the District Court and order Mr. Singh's release for the following reasons. First, the appellant's claims challenge legal and constitutional due process violations that are cognizable by review in this Court. Secondly, the immigration judge failed to utilize basic due process protections in deciding to further prolong Mr. Singh's detention. And lastly, the immigration judge found that Mr. Singh was not a flight risk and the evidence used to support its finding of dangerousness is legally insufficient. On the question of jurisdiction, the District Court found that the appellant's claims were challenges to the discretionary authority of the Attorney General in an attempt to circumvent 1226E. However, this is not the case. All of the appellant's claims go directly towards legal issues and constitutional due process violations. As Your Honor pointed out, the first sentence of 1226E contemplates that the only things shielded from review in the federal courts are discretionary decisions of the immigration judge. But that is not what Mr. Singh has challenged. Mr. Singh has challenged the processes used in his hearing. Okay, be specific. What's the – you're challenging the clear and convincing evidence standard that there was no standard articulated? Correct, Your Honor. That's one of the challenges, that the standard wasn't articulated. And what's the other? The others would be that an impermissibly low burden of proof was applied, that Mr. Singh wasn't given an opportunity to confront the evidence used against him. And some of those drift into what seem to be evidentiary rulings. You're trying to take what in a trial would be borderline, if at all, constitutional issues and elevate a whole raft of issues into a constitutional domain. That's troublesome because if the district courts are going to start reviewing evidentiary rulings and the like, the rap sheet and so on and so forth, we're getting a very complicated process here, aren't we? Well, I'd like to address that in a couple of points. Dealing with the rap sheet specifically, the appellee has in the government has never challenged that the rap sheet did not have authentication and has never challenged, for example, the appellant's claim that because of that – Why is that – if it's not authenticated, why is that a constitutional issue? Because that goes directly to the reliability of the evidence used against Mr. Singh. That because his – all of the decisions of this court in review of all these issues – So every time a district court rules in a trial that there is or isn't authentication, that raises a constitutional issue? Not necessarily, Your Honor. And cases of this court have drawn a distinction in that area. The appellant's claim isn't that the evidence proffered for authentication was insufficient, but the appellant's claim that has never been challenged by the government, rather is that there was absolutely no attempt at authentication whatsoever. So we're not asking the courts, the Federal courts, to review whether or not particular testimony was sufficient for the purposes of authentication. Counsel, I haven't seen any place in your briefs that you have – that you have challenged substantively the authentication or that you've raised any kind of showing as to why this isn't just harmless error at all. On the point of whether we've challenged the actual authentication and whether that should be substantial, in the appellant's opening brief, there was significant discussion of the rap sheet and why certain rules should be applied to it in terms of authentication. Why authentication? You keep telling me about authentication. At this point, we're way down the road. It would be really useful at this point, it seems to me, if you come forward and say there's a mistake on page 7 of this rap sheet and our client was damaged as a result of that because he's been charged with a – he's been accused of a crime that he was later acquitted of or was dismissed or wasn't his. But I haven't heard any argument like that. So it seems to me that if there's error here in admitting the rap sheet and failing to authenticate it, that it may be harmless error. So where's the harm? Sure. As a threshold matter, this Court, in cases like Homar, has found that error and prejudice don't have to be specifically and definitively articulated, just that there may have been an error and that that may have implicated prejudice. And relative to the rap sheet specifically, if you look at the very first page of the rap sheet, it lists over 12 potential names for Mr. Singh. And there was no attempt to make sure that those names actually matched up to this specific individual. So at any time did you come back and say, these aren't our Mr. Singh's names and, therefore, he's been accused of crimes here on this rap sheet that are not his crimes? That goes to exactly another one of the procedural violations that occurred in this case. I'm taking by the fact that you didn't answer my question that the answer is no. I'm sorry. I was getting to that. The answer is yes. At the very end of the immigration hearing, counsel actually objected to the entry of the rap sheet, and at that point the immigration judge just took it into evidence and closed the proceeding and rendered a decision. There was no opportunity to actually respond to that piece of evidence. In Mrs. Cooper's affidavit and declaration, she stated that the appellant, Mr. Singh, was given no opportunity to respond to the evidence. Okay. At any time, counsel, have you come back with an affidavit from Mr. Singh or from a prior lawyer or somebody that says, these aren't his crimes?  There is not that specific assertion in the record. Okay. So we don't have any evidence in the record, then, that the things that were in the rap sheet that the I.J. considered aren't actually attributable to Mr. Singh. We do not have any definitive statements in the record. So if the admission of the rap sheet was error, it appears that it may be harmless error. That is, it looks like we may have relied on an unauthenticated document, but there's no evidence that, in fact, the document is inaccurate. Your Honor, there is no evidence. You're correct. There is no evidence in the record that would specifically support that there was identifiable error. But in dealing with error in the due process context, that is not the standard that this Court has required. And the rap sheet itself, one of the reasons they're so unreliable, is evidenced exactly by the immigration judge's decision. If you look at the immigration judge's written memo, it states, for example, that there were three failures to appear. But upon closer inspection of the actual rap sheet, two of those failures to appear appear to relate to the exact same incident. But there's no way of knowing that definitively. There's no way of knowing the disposition of any of the allegations in the rap sheet, whether or not, for example, a certain failure to appear might have been a misunderstanding. Maybe Mr. Singh was in custody at that time, and therefore that failure to appear wasn't actually pursued by the courts. There's no way to know whether the allegations and issues raised by the rap sheet actually implicate issues that a court and an immigration judge should be concerned with when they're trying to determine dangerousness and flight risk, especially when we're dealing with an individual's most fundamental liberty interest. And it's that significant interest that Mr. Singh has in avoiding an unlawful detention that should sort of inform and animate all of this Court's opinions about the procedures and processes used. So while we can't exactly point to some specific place in the record that this was definitive error, we can certainly say that in this case, Mr. Singh has an incredible interest in having a set of fair procedures. And this Court — I want to address — we'll accept your — we understand your argument. You have raised also, I believe, the absence of a transcript. Correct. Now, what do you mean by a transcript? Do you mean that there has to be a court reporter in these hearings that produces a contemporaneous transcript or a tape recording that you can then have transcribed? What are you asking for? Any of those methods would possibly be acceptable. Whatever sort of method or permutation — Well, if they have a tape, if these were taped, that would be sufficient. Only if that tape led to an actual creation of a transcript, a creation of a written transcript — You mean automatically? — that could be reviewed. Automatically created? What if it's not disputed? If there was a process, which there is in the BIA manual, for an individual to actually ask for a written transcript, that request for a transcript should be granted. I see. Okay. And in this case, the lack of transcript resulted in the BIA looking specifically at the IJ's memorandum for record. So an administrative agency created the record based on another member of that administrative agency's sort of subjective understanding of what the evidence was in that case. Was there a request for any kind of contemporaneous taping or transcribing at the time of the hearing? At the very beginning of the hearing, there was a request that at least the hearing be taped. And it was denied. The request that was made wasn't specifically addressed, so there's no evidence in the record of what the actual response was, because, again, there's no transcript. Was there a tape? We do not believe there's a tape. We've never had access to a tape or seen a tape. Have you asked for a tape? There's no evidence specifically in the record of Mr. Singh or his counsel requesting copies of the tape. Okay, so we don't know whether there was a tape, and you just said that if there was a tape, that would be sufficient so long as there was a request to transcribe it. We're honored. Was there a request to transcribe a tape? There was a request to produce a transcript specifically in writing that occurred after the hearing. And no response, or it was denied? It was denied. Okay. If there are no further questions, I'll save my small remaining time for a moment. Please, the Court. William Ward for the government. This case involves a criminal alien who's been ordered removed from this country by the Board of Immigration Appeals. He comes from Fiji, and his foreseeable removal is probable. He received a bond hearing where the IJ found that he was a danger to the community and a flight risk. He's received all the process that he is due, and the Court should affirm the denial of his habeas petition. Could I ask you two questions? One is, does the government have a position on what the standard of proof is? Is it clear and convincing that the government has to prove flight risk or danger by? Is it any standard? Is it whatever the Attorney General decides? And secondly, I'm going to let you answer these questions, but I'd like to get the government's position. On the issue of transcript taping, the asylum hearings are taped, are they not? They are. So the IJ chambers are all set up for taping. Some better than others. Some better than others. I just spent an hour and a half last night reading a transcript of one that had three different hearings and, yeah, garbled to say the least. But they are set up for taping. Yes. Is there any reason why the bond hearings themselves wouldn't be taped, just like the asylum hearings? Well, I'll start with that question first and then come back to the first. The reason is that historically they've been treated as separate. As you point out, they're- But they take place in the IJ's hearing room. They take place- They're all set up, so it's a matter of pushing a button, correct? Yes, it is. And so the issue really is not whether it's a simple thing to do, I think, but you go to the question of whether this additional safeguard would prevent an erroneous deprivation of liberty. And here, because of the determination of the IJ reflected in a bond memo, goes to the Board of Immigration Appeals and is reviewed there. And because of the limited discretion, or the limited review, habeas review that the court has, there is no danger of an erroneous deprivation of liberty. And I think that's the- Whoa, whoa, whoa, just a minute. Let's concede that you may be right on the 1226E, so we take the courts out of it, okay? Why wouldn't it be useful to the BIA to have an alien come forward and say, are you kidding me? We could hear the IJ snoring during the hearing. And so he's not paying attention while our witnesses are on the stand. And he seems to be asking some mild questions during the government's presentation, and then he just denies the bond hearing. And if you've got this on tape, why wouldn't that be relevant to a question of whether there had been an erroneous deprivation of the alien's rights? Well, as a matter of- And the cost of taping here to the government, the transcription may be different, but the cost of taping seems just de minimis. As a matter of policy, Judge Biby, I don't disagree in the slightest, but the issue- Of the due process clause under Matthews v. Eldridge. Why in a simple balancing test wouldn't it be easy to say, look, this is nearly costless to the government, and we've got a serious- We have serious interests here. We have aliens who are going to be detained for years on end, and all we need is the cost of a tape. I think at the end of the day, the BIA review is under the standard of reasonableness. You know, when you review IJ and BIA decisions, you know many times this Court has found that the IJ's articulation in their written opinions or their oral opinions don't comport with the evidence that is actually presented at the hearing, hearings that are often held over a period of different days, I understand, but that the IJ's not infrequently make mistakes of memory or characterization. But you're saying that whatever the IJ puts into a bond memorandum after the fact is good enough. There's no chance of error. There is. That's correct because the BIA then reviews, of course, issues of law at De Novo. They have the bond hearing. They know what the evidence, the primary evidence- The BIA does not have the bond hearing if there's no record of the hearing. I'm sorry, it has the bond memo. It has the bond memo, right, which is the IJ's memorialization of the decision may involve post hoc decisions. Why isn't this an additional procedural safeguard that the BIA ought to have to ensure that there's no error in the process? Well, I have really no more to say than what I have. As a matter of policy, I think there is a difference between a matter of policy and a constitutional matter, and I think because of that second Matthews factor, the risk is low because you have the other safeguards in the manner that bond hearings have always been held in the administrative process. As Judge Fischer pointed out, and I agree with Judge Fischer, we review asylum hearings all the time, and to see sometimes the gap between what the IJ has put into writing and what the transcript actually reflects, and we've had an additional layer of BIA review in the meantime, doesn't give us a lot of confidence sometimes that this process is going to work as you've described it. I understand. May I move to the burden of proof? Please. Preponderance of the evidence is the answer. 1226, and I think there are such great distinctions between the criminal alien in this situation and the civil commitment hearing, and I just want to flag those for the Court. First one is that we're not talking about indefinite detention. We're talking about prolonged detention. Second, the risk of error is significantly lower because there's already been an agency adjudication, which has been completed and affirmed on appeal. Third, the purpose of the detention is very different. The purpose of the detention is removal as well as protection, not just protection. So the government's interest is very high in making sure that the person is available to be removed. And finally, the alien does hold the keys. They have the right, if they want to, to go to their home country. So they are in a different place than they would be. So their liberty interest is in a very different and much weaker position than a pretrial. Remind me what the rule is now. I know we have this issue with voluntary departure. If the alien departs, they can still litigate their rights from their home country? Yes, and I'm not going to give you a complete answer. There are times when the alien is not able to litigate from overseas, and so I would not put that forward. So in that situation, then, does that affect the burden of proof? No, Your Honor. They don't have the option to litigate. Yes, what I'm saying is that there is the first three factors that I laid out for you are the reasons, I think, why the government's interest is so strong in the detention. But the final factor, which is just a liberty interest, somebody who is civilly committed, somebody who is incarcerated in jail doesn't have the option of saying, gee, I don't want to be here anymore, I'm just going to go back to my home country. But the litigation issue is still a real issue, so I didn't mean to infer otherwise. The posture of alien in detention is much more like a criminal defendant who has been convicted and is awaiting appeal as opposed to any other sort of circumstance, because there, again, the adjudication has been done. The incentive to flee is high. The danger to the community, in some ways, is established by the conviction. And so I think if you were trying to compare, analogize, that's the place where I would go with the analogy. The danger to the community? You're not saying because somebody has been ordered to remove, the danger to the community is automatically established? No, but we are talking about criminal aliens. And a criminal alien case where the danger is the prior DUI? What the IJ has to do is look at the nine GARA factors and make a determination. But we just, you, okay. And I don't, Your Honor, depending on what the DUI is, I certainly wouldn't diminish it in terms of danger. So if the IJ doesn't apply the GARA factors, you're saying the courts aren't going to be looking at this anyway, so it doesn't make any difference, right? It's really what the BIA decides at once. Well, it makes a huge difference to the BIA, but it is within the discretion of the IJ, or the discretion of the Attorney General who has the system. Okay, but you said it's the preponderance of the evidence. I did. And the Attorney General decides that that's the appropriate standard? That is the, well, in this circuit, the, I think the law was very, the CASAS was clear that the burden was on the government. The government, I think, may reserve its right to argue elsewhere that the burden shouldn't be that high. But certainly in this circuit, we're not arguing with the court. All right. Thank you, Your Honor. Counsel? I understand that my time is short, so I'll try and do it. I'll give you a minute. Thank you. Speaking to the issue of transcripts and whether or not an IJ's written memorandum can actually serve as a substitute for a transcript, Mr. Singh's case is a prime example of why that shouldn't be so. The written memorandum issued by the board, issued by the IJ, 36 days after the hearing, directly contradicts the operative dispositive finding of flight risk that the IJ made at the time of hearing. So the written memorandum is entirely in conflict. How does it? In the, at the end of the hearing, the IJ, as has never been contested, said that Mr. Singh was not a flight risk. And that was a final decision. And then once that was appealed, the IJ should have written a memorandum where he said Mr. Singh was a flight risk, entirely contradicting those final conclusions. Now, that goes to the unreliability of these as substitutes for a transcript. Speaking to the burden of proof, in the pretrial context, in certain circumstances, the burden might be preponderance of the evidence. But counsel for the government never once mentioned the fact that there's a substantial liberty interest at stake here. The length of the detention is much longer than in those instances, and the burden of proof should be additionally high to match those considerations. Okay. Thank you. Appreciate the argument.
judges: Hall, Fisher, Bybee